IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| ASSUREDPARTNERS NL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  3:18-cv-111 |
| | ) | |
| EPIC INSURANCE SOLUTIONS | ) | |
| AGENCY LLC AND DAN DAVIS, | ) | |
| | ) | |
| Defendants. | | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff AssuredPartners NL, LLC ("AssuredPartners"), by counsel, for its Complaint For

Injunctive Relief and Damages against Epic Insurance Solutions Agency LLC ("Epic"), and Dan

Davis  (collectively, "Defendants"), states as follows:

## JURISDICTION AND VENUE

1.     AssuredPartners is a Delaware limited liability company, with its principal place of

business in Lake Mary, Florida.  AssuredPartners is licensed and authorized to do business within

the State of Indiana.  AssuredPartners is admitted to sell insurance for safety, risk mitigation,

workers' compensation, employee benefits and related types of products in 13 states, including

Indiana.  AssuredPartners has a strong presence in Indiana with approximately 160 employees

working in offices located in Batesville, Evansville, Indianapolis, Madison, Jeffersonville, and

Rushville.

2.     The only member of AssuredPartners is AssuredPartners Capital, Inc., which is

organized and operating under the laws of Delaware, with its principal place of business in Lake

Mary, Florida.  AssuredPartners is therefore a citizen of Delaware and Florida.

3.       Defendant Epic Insurance Solutions Agency LLC is a Delaware limited liability company with its principal place of business in Louisville, Kentucky.  Epic is an independent insurance company and sells life, health, employee benefits, medical and dental and related types of insurance.  Epic is a direct competitor of AssuredPartners.  In January 2016, Epic opened its first office in Indiana, in Indianapolis.  Epic is preparing to open an Evansville, Indiana office.

4.       Epic's members are:  (1) Brian D. Lamb, a citizen of Ohio, domiciled in Cincinnati, Ohio; (2) Gerald Brady Coogan, a citizen of Ohio, domiciled in Cincinnati, Ohio; and (3) Michael P. Speaker, a citizen of Ohio, domiciled in Cincinnati, Ohio.  Epic is therefore a citizen of Ohio.

5.       Defendant Dan Davis is a former employee of AssuredPartners and is currently employed by Epic in substantially the same capacity that Davis worked for AssuredPartners.  Epic has hired Davis to spearhead a new Evansville, Indiana office.  Davis is a citizen of Indiana, domiciled in Newburgh, Indiana.

6.       This Court has personal jurisdiction over Davis because Davis is an Indiana resident and because he caused events to occur in Evansville, Indiana out of which this Complaint arises.  This Court has personal jurisdiction over Epic because it conducts business within the state of Indiana and because Epic caused events to occur in Evansville, Indiana out of which this Complaint arises.

7.       This Court has subject matter jurisdiction over AssuredPartners' claims pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship and because the amount in controversy, exclusive of interest and costs, while impossible to calculate with precision, exceeds $75,000.  This Court also has subject matter jurisdiction over AssuredPartners' claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because the First Cause of Action alleges a claim for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832

*et seq.*, and AssuredPartners' other claims are so related to its federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to AssuredPartners' claims occurred in this district.

## THE PARTIES

### *AssuredPartners NL, LLC (AssuredPartners)*

9.     AssuredPartners NL, LLC, is a Delaware limited liability company with its principal place of business in Lake Mary, Florida.  Before it converted to an LLC, AssuredPartners NL, LLC was previously known as Assured Neace Lukens Insurance Agency, Inc., which was previously known as Assured NL Insurance Agency, Inc.   AssuredPartners sells insurance products and services relating to safety, workers' compensation, and employee benefits, among others.

10.     AssuredPartners currently has offices in Batesville, Evansville, Indianapolis, Madison, Jeffersonville, and Rushville, Indiana, employing more than 150 employees.  Previously, AssuredPartners had an office in Newburgh, Indiana as well.  In October 2013, AssuredPartners combined its Newburgh, Indiana and Evansville, Indiana offices into one office in Evansville, Indiana.

11.     AssuredPartners is in engaged in interstate commerce.  AssuredPartners has offices in 38 states, employing approximately 5,000 employees.

12.     AssuredPartners' business involves the collection, generation, use, and protection of confidential information, including, but not limited to, the identity of customers and prospective customers, including their contact information and insurance needs; vendors; insurance carriers; policy terms of existing customers; expiration/renewal dates; AssuredPartners' financial condition

including its marketing plans, pricing and business strategies and methods; and the services and products AssuredPartners offers, including insurance rating information; and pricing information for AssuredPartners' insurance offerings and other products.

13.     AssuredPartners' confidential information is the product of years of accumulation and distillation of proprietary information.  AssuredPartners has made a considerable investment in terms of hours and expense to accumulate and maintain this confidential information.

14.     AssuredPartners goes to great efforts to maintain the secrecy of its confidential information, including, but not limited to: (1) requiring certain of its employees and agents to execute agreements requiring the maintenance of the confidentiality of the information both during and post-relationship; (2) imposing confidentiality provisions in its Employee Handbook requiring the maintenance of the confidentiality of its confidential information; (3) protecting access to the confidential and trade secret database through password-protected access; (4) providing continued verbal and written reinforcement of the confidentiality of AssuredPartners' confidential information at all levels of AssuredPartners' communications; and (5) engaging in post-employment efforts to ensure its confidential information is maintained by departing employees in confidence and not shared with competitors. This confidential information is not available to the public and is not shared with the public, and it is competitively valuable to AssuredPartners' competitors.

15.     AssuredPartners' employees who sell insurance products execute an Employment and Restrictive Covenants Agreement ("Agreement") under which the employee agrees that he or she "shall not use, or disclose to any third party, any Confidential Information for any reason other than as intended within the scope of Employee's employment or as approved by an executive officer of the Company in writing.  Upon separation of employment for any reason, or at any other

time upon the request of the company, Employee shall immediately deliver to Employer all documents, materials, and data (and copies thereof), in tangible, electronic, or intangible form, relating to the business of the Company."

16.     AssuredPartners' employees who sell insurance products play a fundamental role in AssuredPartners' business.  These employees function as the primary contact point with AssuredPartners for its customers and prospective customers.  These employees solicit business for the Company, provide quotes and proposals to prospective customers, and, once policies are in place, provide day-to-day support as required by customers.  In addition, these employees are also responsible for establishing and maintaining customer relationships to foster policy renewal as they expire.  In essence, AssuredPartners' employees who sell insurance products are the "face" of AssuredPartners to its current and future customers.

17.     AssuredPartners provides its employees who sell insurance products with substantial resources, including access to AssuredPartners' confidential business and customer information, and in turn, these employees promote AssuredPartners' business and generate good will for AssuredPartners' by developing long-term, personal relationships with AssuredPartners' customers.

***Epic Insurance Solutions Agency LLC ("Epic")***

18.     Epic, which is headquartered in Louisville, Kentucky is an independent insurance company and works with carriers in employee benefits, property, casualty, life, medical, and dental

insurance, among other similar products to sell insurance products and services to customers.  Epic is a direct competitor of AssuredPartners.

19.     Epic first opened in Louisville in April 2013.  In January 2016, Epic opened its first office in Indiana, in Indianapolis.  Epic has recently opened a new Evansville, Indiana office, with the assistance of Davis and Epic employee Rick Mitchum ("Mitchum").

***Dan Davis***

20.     Defendant Dan Davis began his employment with AssuredPartners on or about January 1, 2013 as a Senior Vice President / Employee Benefits for AssuredPartners' Newburgh, Indiana office.  Davis is licensed by the Indiana Department of Insurance as a "Resident Producer Individual" to sell Health, Life, Accident, Property and Casualty insurance.   During his employment with AssuredPartners, Davis's sales territory included the Evansville and Newburgh, Indiana and Owensboro and Louisville, Kentucky areas.

21.     On or about January 1, 2013, Davis executed the Employment and Restrictive Covenants Agreement ("Agreement") with Assured NL Insurance Agency, Inc.  Attached as **Exhibit A** to the Complaint is a true and correct copy of the Agreement.

22.     Davis's Agreement includes provisions relating to non-disclosure of confidential information, restrictions on solicitation of business on behalf of other insurance companies during the term of the Agreement, and restrictions on solicitation of or conducting of business with AssuredPartners' customers for a period of two (2) years following the termination of the Agreement.

23.     The Agreement states that "[t]he parties acknowledge that the restrictive covenants in this Agreement constitute a significant element of value of the business and assets of the Company and that, without such restrictive covenants, Company would either not hire Employee

6

or would compensate Employee at least 25% lower.  These restrictive covenants are reasonably necessary to protect the Company's legitimate business interests, including but not limited to, its trade secrets, confidential business information, customer relationships, and customer goodwill."

(Exhibit A at p. 1.)

24.     With regard to non-disclosure of AssuredPartners' confidential information, the Agreement states in relevant part as follows:

3.1.     For purposes of this Agreement, the term "Confidential Information" means all confidential, proprietary and/or non-public information, whether or not in written or recorded form, concerning the business or affairs of the Company, including but not limited to, information concerning:

3.11.     the Company's clients, prospective clients, acquisition targets, vendors, insurance carriers, policy forms, rating information, expiration dates, and/or contracts or arrangements (including special terms and deals);

3.1.2.     the Company's financial condition, results of operations, marketing plans, business plans, operations, pricing, promotions, and business strategies and methods; and

3.1.3.     the services and products offered by the Company to its clients or prospective clients, including, but not limited to, policy forms, rating information, expiration dates, information on risk characteristics, and information concerning insurance markets for large or unusual risks.

3.2.     Employee acknowledges and agrees that all Confidential Information is the sole and exclusive property of the Company.  Accordingly, both during and after employment with the Company (whether such separation from employment is voluntary or involuntary, or with or without cause), Employee shall not use, or disclose to any third party, any Confidential Information for any reason other than as intended within the scope of employee's employment or as approved by an executive officer of the Company in writing.  Upon separation of employment for any reason, or at any other time upon request of the Company, Employee shall immediately deliver to Employer all documents, materials and data (and copies thereof), in tangible, electronic, or intangible form, relating to the business of the Company.

(*See* Exhibit A ¶¶ 3.1 and 3.2.)

25.     With regard to the restrictive covenants relating to AssuredPartners' customers, the

Agreement states in relevant part as follows:

4.1.    Except on behalf of the Company, during Employee's employment with the Company and for twenty-four (24) months after Employee's employment ends with the Company (whether voluntary or involuntary or with or without cause), Employee shall not directly or indirectly through another person or entity:

4.1.1.  offer, sell, solicit, quote, place, provide, renew or service any insurance product or service to, or on behalf of, any Restricted Client;

4.1.2.  take any action intended, or reasonably likely, to cause any vendor, insurance carrier, wholesale broker, Restricted Client, other client of the Company, or any other third party with a material business relationship with the Company to cease or refrain from doing business with the Company; or

4.1.3.  solicit, hire, engage or seek to induce any of the Company's employees to terminate such employee's employment with the Company for any reason, including, without limitation, to work for Employee or a competitor of the Company.

4.2.    *Restricted Clients.*  For purposes of this Agreement, "Restricted Client" means the following:

4.2.1.  any client of the Company at the office where Employee was employed during the two (2) years immediately preceding the date on which Employees employment with the Company ended for any reason, whether voluntary or involuntary or with or without cause (the "Separation Date");

4.2.2.  any client of the Company during the two (2) years immediately preceding the Separation Date as to which the Employee either had some involvement in proposing, selling, quoting, placing, providing, servicing or renewing any insurance product or service or about whom the Employee received Confidential Information; or

4.2.3   any prospective client of the Company within two (2) years immediately preceding the Separation Date as to which Employee had involvement in proposing, selling, quoting, placing, providing, servicing, or renewing any insurance product or service or about whom Employee received Confidential Information.

(*See* Exhibit A ¶¶ 4.2.; 4.2.1-4.2.3.)

26.     With regard to remedies available to AssuredPartners for any breach of the above-referenced covenants, the Agreement states in relevant part as follows:

> 4.3.     Enforcement.  In the event of the breach or a threatened breach by Employee of any of the obligations of **Section 4.1** above, the Company, in addition to other rights and remedies existing in its favor, shall be entitled to injunctive relief and may apply to any court for specific performance, temporary, preliminary, and/or permanent injunctive relief, or other relief in order to enforce the obligations or prevent any violations of the obligations.  In addition, in the event of an alleged breach or violation by Employee of the obligations in **Section 4.1**, the Restricted Period shall be tolled until such breach or violation has been cured.

 (*See* Exhibits A ¶ 4.3.) (Emphasis in original.)

27.     The Agreement also states:

> 10.     ***Reasonableness; Modification***.  Employee agrees that:  (a) the obligations and restrictions in **Section 4** of this Agreement are reasonable in time in [sic] and client limitation; (b) the number of Restricted Clients is extremely small in comparison to the total number of potential or prospective clients; and (c) the obligations and restrictions of **Section 4** do not significantly affect Employee's ability to engage in a lawful profession or business to compete fairly with the Company. Notwithstanding the foregoing, if, at the time of enforcement any of the obligations in **Section 4**, a court shall hold that the duration or scope of Employee's obligations under **Section 4** are unreasonable or enforceable, the parties agree that the maximum duration, scope and list of Restricted Clients, as determined by the court, shall be substituted and that the court shall enforce the obligations as modified.

(Exhibit A ¶ 10.) (Emphasis in original.)

28.     The Agreement further provides that, "[i]f the Company engages one or more attorneys to enforce any of the terms of this Agreement or otherwise protect the Company against any breach or threatened breach of this Agreement, whether or not a lawsuit or claim is filed, Employee shall be responsible for all of the Company's actual attorney's fees, costs and expenses, and all other reasonable costs and expenses, in addition to any other legal or equitable relief to which the Company may be entitled."  (*See* Exhibit A ¶ 18).)

## **DAVIS'S BREACH OF CONFIDENTIALITY OBLIGATIONS, MISAPPROPRIATION**

## **OF TRADE SECRETS, AND DEALINGS WITH EPIC**

29.    Davis and Epic and its agents acting in concert with one another, including but not limited to current Epic employee Mitchum are conspiring to take away AssuredPartners' business. Davis and Mitchum are long-time friends.

30.    After the October 2013 combination of AssuredPartners' Newburgh and Evansville offices, Davis primarily worked for AssuredPartners from his home in Newburgh, Indiana.

31.    Between 2016 and 2018, Davis earned a large sum in commissions from sales of insurance products.

32.    Over the course of his employment with AssuredPartners, and by virtue of his position within the Company, Davis had access to AssuredPartners' confidential and proprietary business information, including, but not limited to, the identity of customers and prospective customers, including their contact information and insurance needs; vendors; insurance carriers; policy terms of existing customers; expiration/renewal dates; the Company's financial condition including its marketing plans, pricing and business strategies and methods; the services and products AssuredPartners offers, including insurance rating information; and pricing information for AssuredPartners' insurance offerings and other products.

33.    On February 21, 2018 at 4:03 a.m., Davis sent himself an email attaching the April 1, 2018 "Renewal Cost Summary" for a customer for which Davis served as Primary Sales Lead.   The Renewal Cost Summary included the specific plans, contract terms (including premiums and deductibles), and the annual plan exposures for each of the various employee benefits plans AssuredPartners offered to that particular customer.   The Renewal Cost Summary also included the employee benefits plan offering that the customer ultimately chose in 2017, and

the specific plans, contract terms (including premiums and deductibles), and the annual plan exposures for that offering.  After Davis's resignation on April 17, 2018, AssuredPartners was informed that this customer was moving its business to Epic.

34.    On Saturday, April 7, 2018 at 12:55 p.m., Davis sent himself an email which attached 19 files relating to an AssuredPartners customer for which Davis served as Primary Sales Lead.  The attachments included, among others, confidential, proprietary, trade secret information belonging to AssuredPartners including insurance quotes, the Renewal Cost Summary, and the renewal presentation (and underlying documentation Davis had used to prepare it) for that customer in 2017.  This particular customer's renewal date is in July each year.  On June 10, 2018, this customer informed AssuredPartners that it would be moving its business to Epic and that the new broker was Mitchum.

35.    On Saturday, April 7, 2018, at 1:05 p.m., Davis sent himself an email which attached 19 files relating to an AssuredPartners' customer for which Davis served as Primary Sales Lead. This particular customer's renewal date is in July each year.  The attachments included, among others, confidential, proprietary, trade secret information belonging to AssuredPartners, including the Renewal Cost Summary, and the renewal presentation (and underlying documentation Davis had used to prepare it) for that customer in 2017.

36.    On Saturday, April 7, 2018 at 1:12 p.m., Davis sent himself an email which attached 23 files relating to an AssuredPartners' customer for which Davis served as Primary Sales Lead.  The attachments included, among others confidential, proprietary, trade secret information belonging to AssuredPartners, including the Renewal Cost Summary, and the renewal presentation (and underlying documentation Davis had used to prepare it) for that customer in 2017.  On April

20, 2018, AssuredPartners received notice that this customer moved its business to Epic and that the new broker was Mitchum.

37.     Some of the aforementioned email attachments that Davis sent to himself included Protected Health Information ("PHI") as the term is defined by HIPAA.

38.     On April 16, 2018, Davis sent Executive Vice President, Employee Benefits, Matt Fuqua a letter serving as "formal notification that I am resigning my position with AssuredPartners on May 1, 2018."

39.     On April 17, 2018, AssuredPartners accepted Davis's resignation of his employment effective immediately.  On that same date, AssuredPartners sent Davis a letter advising that his employment ended April 17, 2018.  In that letter, AssuredPartners specifically "advised that you are expected to adhere to the AssuredPartners Employment and Restrictive Covenants Agreement" and that "[i]f you have any company property including but not limited to files, customer lists, supplies, computers, docking stations, power cords or telephone equipment, be sure to return these items promptly."  Attached as **Exhibit B** is a true and correct copy of the April 17, 2018 letter.  Davis has not returned any company property to AssuredPartners.

40.     As of April 17, 2018, Davis was the primary sales lead for 24 accounts, totaling more than $8.3 million in estimated annualized premiums, and almost $800,000 in estimated annualized revenue.

41.     On April 20, 2018, based upon the suspicious loss of business to Epic of which AssuredPartners learned on April 20, 2018, AssuredPartners sent Davis a letter regarding Davis's violations of the Agreement and demanding that Davis cease and desist from any further violations of the Agreement.  Attached as **Exhibit C** is a true and correct copy of the letter.

42.     After AssuredPartners sent the April 20, 2018 letter to Davis, on or about June 20, 2018, AssuredPartners learned that another customer was moving its business to Epic, and that its new insurance broker was Mitchum.

43.     Epic hired Davis in April 2018 in substantially the same capacity in which he worked for AssuredPartners, and to spearhead Epic's new Evansville, Indiana office. Davis is presently employed by Epic, as is Mitchum.

44.     Mitchum is utilizing the AssuredPartners' confidential, proprietary and trade secret information Davis retained after his resignation in violation of the Agreement, to solicit AssuredPartners' customers.   In so doing, Davis is indirectly soliciting AssuredPartners' customers in violation of the Agreement.

45.     Davis has, directly and indirectly (including but not limited to, through Mitchum), on behalf of Epic, taken and continues to take customers and business from AssuredPartners to Epic based on confidential information Davis acquired that belonged to AssuredPartners.

46.     Defendants have wrongfully and unlawfully used AssuredPartners' confidential information to undermine and interfere with AssuredPartners' provision of insurance products and services and to lure AssuredPartners' customers to Epic.

47.     Davis, including but not limited to through Mitchum, has in direct violation of the Davis's Agreement with AssuredPartners, solicited AssuredPartners' customers on behalf of Epic using AssuredPartners' confidential information.

48.     Defendants have misused and misappropriated AssuredPartners' confidential information by soliciting AssuredPartners' customers with the intention of inducing them to do business with Epic, a competitor of AssuredPartners.

49.     If Defendants succeed in continuing to divert AssuredPartners' customers, AssuredPartners' years of work to develop its confidential information and customer relationships will be forever damaged.

50.     Defendants' wrongful conduct has compromised AssuredPartners' business, including its relationships with its customers, and has resulted in lost revenues and other damages.

51.     As a result of Defendants' misconduct, AssuredPartners has already lost three customers to Epic, representing significant lost premiums to AssuredPartners, and will likely continue to lose additional customers and significant premiums.

## FIRST CAUSE OF ACTION

### Violation of the Defend Trade Secrets Act 18 U.S.C. 1832 *et seq*.

52.     AssuredPartners re-alleges and incorporates paragraphs 1 through 51 by reference as if fully set forth herein.

53.     AssuredPartners' information regarding the identity of clients and prospective customers, including their contact information and insurance needs; vendors; insurance carriers; policy terms of existing customers; expiration/renewal dates; AssuredPartners' financial condition including its marketing plans, pricing and business strategies and methods; and the services and products AssuredPartners offers, including insurance rating information; and pricing information for AssuredPartners' insurance offerings and other products, constitute trade secrets as defined by the Defend Trade Secrets Act, 18 U.S.C. § 1832 et seq. ("DTSA"). This information has independent economic value because it is not generally known to and not readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.

54.     The value of AssuredPartners' trade secrets is demonstrated, in part, by Davis's misappropriation of those trade secrets prior to his resignation from AssuredPartners.

55.     AssuredPartners' confidential information is not generally available to AssuredPartners' competitors.  It derives independent economic value from not being generally known to other persons who could otherwise obtain economic value from its disclosure or use, and it is the subject of efforts that are reasonable under the circumstances to maintain its confidentiality.

56.     AssuredPartners' confidential information provides critical commercial and competitive advantages to AssuredPartners.

57.     AssuredPartners has taken reasonable and adequate precautions to protect its confidential information, including, but not limited to, limiting access to the information to a select group of individuals on a need-to-know basis in order to perform their employment and agent duties, and requiring certain individuals to sign confidentiality agreements.

58.     AssuredPartners' trade secrets are related to its products and services used in, or intended to be used in, interstate or foreign commerce.

59.     Davis had access to AssuredPartners' trade secrets, which were provided exclusively for the purpose of furthering AssuredPartners' business.

60.     Defendants are aware of the confidential and proprietary nature of AssuredPartners' confidential information, and of their duty not to use such information for their own benefit, or for the benefit of any person or entity other than AssuredPartners.

61.     Davis and Epic willfully, wrongfully, and maliciously misappropriated AssuredPartners' confidential information by using their knowledge of AssuredPartners' trade secret information relating to its customers to AssuredPartners' detriment.

62.     Davis and Epic have engaged in actual and threatened misappropriation of AssuredPartners' trade secrets.

63.     AssuredPartners has suffered and will continue to suffer irreparable harm, including, but not limited to, a loss of its competitive advantage, loss of business, loss of goodwill, and other damage unless Davis and Epic and those acting in concert, including but not limited to Mitchum, with them are enjoined from continuing to benefit from any unlawful misappropriation of AssuredPartners' trade secrets and confidential information.

64.     Unless restrained, Davis, Epic and those acting in concert with them, including but not limited to Mitchum, will continue to misappropriate AssuredPartners' trade secrets in violation of the Act.

65.     As a direct and proximate consequence of the conduct of Davis and Epic and those acting in concert with them, including but not limited to Mitchum, AssuredPartners has been damaged in an amount to be proven at trial.

66.     The conduct of Davis and Epic, and those acting in concert with them, including but not limited to Mitchum, was willful, malicious, and done in conscious disregard of AssuredPartners' rights, entitling AssuredPartners to exemplary damages and attorney's fees and costs in an amount to be proven at trial.

67.     Pursuant to the Act, AssuredPartners is entitled to preliminary and permanent injunctive relief, enjoining and restraining Davis and Epic and those acting in concert with them, including but not limited to Mitchum, from all acts of actual and threatened misappropriation of the trade secrets of AssuredPartners; and an award of compensatory damages for actual losses caused by Defendants' misappropriation of trade secrets, attorneys' fees, an award of damages for unjust enrichment caused by Defendants' misappropriation of trade secrets, and an award of exemplary damages under 18 U.S.C. § 1836(b)(3).

**SECOND CAUSE OF ACTION**

**Violation of the Indiana Uniform Trade Secrets Act by Davis and Epic**

68.     AssuredPartners re-alleges and incorporates paragraphs 1 through 67 of this Complaint by reference as if fully set forth herein.

69.     AssuredPartners is the rightful owner of its confidential information, including, but not limited to the identity of customers and prospective customers, including their contact information and insurance needs; vendors; insurance carriers; policy terms of existing customers; expiration/renewal dates; AssuredPartners' financial condition including its marketing plans, pricing and business strategies and methods; and the services and products AssuredPartners offers, including insurance rating information; and pricing information for AssuredPartners' insurance offerings and other products.

70.     Davis had access to AssuredPartners' confidential information.

71.     AssuredPartners' confidential information is not generally available to AssuredPartners' competitors.  It derives independent economic value from not being generally known to other persons who could otherwise obtain economic value from its disclosure or use, and it is the subject of efforts that are reasonable under the circumstances to maintain its confidentiality.

72.     AssuredPartners' confidential information provides critical commercial and competitive advantages to AssuredPartners.

73.     AssuredPartners has taken reasonable and adequate precautions to protect its confidential information, including, but not limited to, limiting access to the information to a select group of individuals on a need-to-know basis in order to perform their employment and agent duties, and requiring certain individuals to sign confidentiality agreements.

74.     Defendants are prohibited from misappropriating AssuredPartners' trade secrets by the Indiana's Uniform Trade Secret Act, codified beginning at Indiana Code § 24-2-3-1.

75.     Defendants are aware of the confidential and proprietary nature of AssuredPartners' confidential information, and of their duty not to use such information for their own benefit, or for the benefit of any person or entity other than AssuredPartners.

76.     Davis and Epic willfully, wrongfully, and maliciously misappropriated AssuredPartners' confidential information by using their knowledge of AssuredPartners' trade secret information relating to its customers to AssuredPartners' detriment.

77.     Davis and Epic have engaged in actual and threatened misappropriation of AssuredPartners' trade secrets

78.     AssuredPartners has suffered and will continue to suffer irreparable harm, including, but not limited to, a loss of its competitive advantage, loss of business, loss of goodwill, and other damage unless Davis and Epic and those acting in concert, including but not limited to Mitchum, with them are enjoined from continuing to benefit from any unlawful misappropriation of AssuredPartners' trade secrets and confidential information.

79.     Unless restrained, Davis, Epic and those acting in concert with them, including but not limited to Mitchum, will continue to misappropriate AssuredPartners' trade secrets in violation of the Act.

80.     As a direct and proximate consequence of the conduct of Davis and Epic and those acting in concert with them, including but not limited to Mitchum, AssuredPartners has been damaged in an amount to be proven at trial.

81.     The conduct of Davis and Epic, and those acting in concert with them, including but not limited to Mitchum, was willful, malicious, and done in conscious disregard of AssuredPartners' rights, entitling AssuredPartners to exemplary damages and attorney's fees and costs in an amount to be proven at trial.

82.     Pursuant to the Act, AssuredPartners is entitled to preliminary and permanent injunctive relief, enjoining and restraining Davis and Epic and those acting in concert with them, including but not limited to Mitchum, from all acts of actual and threatened misappropriation of the trade secrets of AssuredPartners; and an award of damages against Davis and Epic to compensate AssuredPartners for all losses proximately caused by such acts of actual and threatened misappropriation.

## THIRD CAUSE OF ACTION

### Breach of Contract against Davis

83.     AssuredPartners re-alleges and incorporates paragraphs 1 through 82 by reference as if fully set forth herein.

84.     AssuredPartners entered into an agreement with Davis which required ongoing mutual duties of the parties.

85.     The agreement with Davis is valid and enforceable.

86.     AssuredPartners performed all of its obligations under its agreement with Davis.

87.     Davis materially breached his Agreement by knowingly and willfully making personal use of AssuredPartners' confidential information for the benefit of himself and AssuredPartners' competitor Epic, and to AssuredPartners' detriment.

88.     Epic aided and abetted Davis's material breached of his Agreement by knowingly and willfully (including but not limited to, through Davis providing AssuredPartners' confidential information to Mitchum and Mitchum's use of that information on behalf of Epic) using

AssuredPartners' confidential information to wrongfully acquire business from AssuredPartners' current and prospective customers on behalf of Epic.

89.    As a direct and proximate consequence of Davis's and Epic's conduct, AssuredPartners has been damaged.  AssuredPartners alleges its lost profits as special damages.

90.    As described above, Davis has breached, and will continue to breach, his obligations to AssuredPartners, and AssuredPartners has suffered, and will continue to suffer, irreparable harm and other damage as a result of their actions in the absence of injunctive relief.

**FOURTH CAUSE OF ACTION**

**Tortious Interference with Contract Against Epic**

91.    AssuredPartners re-alleges and incorporates paragraphs 1 through 90 by reference as if fully set forth herein.

92.    AssuredPartners possesses advantageous business relationships and expectancies with its current and prospective customers with whom AssuredPartners has an expectation of continued service.

93.    AssuredPartners possesses valuable contractual commitments from its employees, including restrictive covenants and confidentiality agreements.

94.    Epic had knowledge of AssuredPartners' contracts or relationships with its customers and of AssuredPartners' expectancy that these customers would continue to utilize its products and services, including purchasing future insurance policies.

95.    Epic, individually or in concert with others (including but not limited to Mitchum), had knowledge of AssuredPartners' contracts with its current and former customers, including those which have since moved their business to Epic.

96.    Many of AssuredPartners' customers have been customers for many years.

97.     AssuredPartners reasonably expects that its customers will remain customers in the future.

98.     Having knowledge of these continuing contractual obligations and expectancies, Epic, individually or in concert with others (including but not limited to Mitchum), have interfered with AssuredPartners' contracts and its business expectancies by wrongfully utilizing or disclosing AssuredPartners' confidential and proprietary information for the benefit of Epic, and by soliciting AssuredPartners' customers, and by engaging in other steps, some of which may be unlawful, to move AssuredPartners' business to Epic, and usurping commercial opportunities from AssuredPartners.

99.     Davis and Epic and those acting in concert with them (including but not limited to Mitchum), without privilege or justification, tortiously induced, and continue to tortiously induce, AssuredPartners' customers to terminate their relationships with AssuredPartners, with the deliberate intention of causing damage to AssuredPartners.

100.    The acts of interference of Epic and those acting in concert with it (including but not limited to Mitchum) are and have been intentional, and are improper and without justification.

101.    As a direct and proximate consequence of the tortious interference of Epic and those acting in concert with it (including but not limited to Mitchum) with AssuredPartners' contracts and business relations, AssuredPartners has been and will continue to be irreparably damaged through the immeasurable loss of business, customer relations, profits and goodwill for which there is no adequate remedy at law.

102.    AssuredPartners is entitled to preliminary and permanent injunctive relief against Epic and those acting in concert with it (including but not limited to Mitchum) enjoining and restraining them from further interfering with AssuredPartners' contractual and business relations.

103.     AssuredPartners is further entitled to an award of damages against Epic to compensate AssuredPartners for all loss proximately caused by Defendants' conduct.

104.     As a direct and proximate consequence of Epic's intentional and tortious conduct, AssuredPartners has been damaged in an amount to be proven at trial.

105.     AssuredPartners alleges its lost profits as special damages resulting from Epic's tortious interference.

106.     Epic's tortious conduct was willful, malicious, and done in conscious disregard of AssuredPartners' rights, entitling AssuredPartners to punitive damages and attorney's fees and costs in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Breach of Fiduciary Duty and Duty of Loyalty against
### Davis

107.     AssuredPartners re-alleges and incorporates paragraphs 1 through 106 by reference as if fully set forth herein.

108.     As an employee of AssuredPartners, Davis owed AssuredPartners a fiduciary duty and duties of loyalty.

109.     Davis has violated the common law fiduciary duty of loyalty and the fiduciary duty arising under his employment relationship and Agreement with AssuredPartners in that, while employed with AssuredPartners, the Davis secretly schemed with others, including but not limited to Mitchum, to deprive AssuredPartners of its customers, records, and trade secrets.

110.     Defendant Davis has specifically breached his fiduciary duty and duty of loyalty to AssuredPartners by using AssuredPartners' confidential and proprietary information and AssuredPartners' property for the benefit of AssuredPartners' competitor Epic and to AssuredPartners' detriment.

111.    As a result of these breaches, AssuredPartners has suffered and will continue to suffer irreparable harm and loss and damages through the loss of customers, revenue, confidential and proprietary information, and/or goodwill.

112.    AssuredPartners alleges its lost profits as special damages resulting from Davis's breach of his fiduciary duty and duties of loyalty to AssuredPartners.

## SIXTH CAUSE OF ACTION

### Civil Conspiracy against all Defendants

113.    The allegations of Paragraphs 1 through 112 are incorporated herein by reference with the same force and effect as if set forth in full below.

114.    Each Defendant combined with one or more of the other Defendants, by concerted action, to accomplish the unlawful purposes alleged herein and/or to accomplish purposes not in themselves unlawful by the unlawful means alleged herein.

115.    Epic and Davis conspired with each other to misappropriate AssuredPartners' trade secrets, breach Davis's Agreement with AssuredPartners, breach Davis's fiduciary duty to AssuredPartners, and tortiously interfere with AssuredPartners' contractual relations and business expectancy.

116.    Each Defendant, as a participant in the conspiracy, is responsible as a joint tortfeasor for any and all damages caused by the wrongful acts regardless of the degree of active participation.

117.    As a consequence of the foregoing, AssuredPartners has suffered and will continue to suffer irreparable harm and loss and damages, including, but not limited to, lost profits.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment by All Defendants

118.    The allegations of Paragraphs 1 through 117 are incorporated herein by reference with the same force and effect as if set forth in full below.

119.    Through the actions alleged herein, the Defendants have been unjustly enriched and benefited.

120.    Benefits, including profits, revenues, and income, received by the Defendants through the actions alleged herein were obtained improperly, unlawfully, and unjustly.

121.    The Individual Defendants have received commissions and other income through the improper and unlawful conduct alleged herein and have been unjustly enriched by it to the detriment and harm of AssuredPartners.

122.    Epic has received revenue, profits, and income through the improper and unlawful conduct alleged herein and have been unjustly enriched to the detriment and harm of AssuredPartners.

123.    As a matter of equity, all Defendants should be required to disgorge any and all revenues, profits, commissions, and income resulting from the improper and unlawful conduct alleged herein and to reimburse AssuredPartners in an amount equal to Defendants' unjust enrichment.

### JURY TRIAL REQUESTED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby requests a jury trial on all issues and claims triable by right by jury.

### PRAYER FOR RELIEF

WHEREFORE, AssuredPartners respectfully requests that this Court:

A.      Preliminarily and permanently enjoin, restrain and prohibit, directly or indirectly, Defendants, whether alone or in concert with others, including any officer, agent, employee, and/or representative of Epic, including but not limited to Mitchum, or their related entities and businesses, until further Order of this Court, as follows:

1.      Davis, and those working in concert with him, including but not limited to Epic and Mitchum, should be immediately enjoined from continuing to solicit, contact, and/or do business with all persons or entities, for the 24-month period immediately preceding the end of Davis's employment (a) which were clients or prospective clients of AssuredPartners with whom Davis had involvement in proposing, selling quoting, placing, providing, servicing, or renewing any insurance product or service; and/or (b) about whom Davis received confidential, proprietary, and/or non-public information; and/or (c) were clients of AssuredPartners' office where Davis was employed (collectively, "Restricted Clients").

2.      Davis, and those working in concert with him, including but not limited to Epic and Mitchum, should be immediately enjoined from continuing to solicit, contact, and/or do business with any vendor, insurance carrier, wholesale broker or any third party with a material business relationship with AssuredPartners (collectively "Material Business Relationships").

3.      Davis and Epic, and those working in concert with them, including but not limited to Mitchum, should be immediately enjoined from tortiously interfering with AssuredPartners' contracts with its Restricted Clients or with its Material Business Relationships.

4.      Davis and Epic, and those working in concert with them, including but not limited to Mitchum, should be immediately enjoined from further use or disclosure of PHI as that term is defined by HIPAA, that Davis received by virtue of his employment with AssuredPartners.

5.      Davis and Epic, and those working in concert with them, including but not limited to Mitchum, should be immediately enjoined from soliciting AssuredPartners' Restricted Clients or Material Business Relationships based on confidential information possessed by Davis or Mitchum belonging to AssuredPartners, or otherwise disclosing, using, and appropriating any of AssuredPartners' confidential information for their own use or for the use of others, directly or indirectly;

6.      All Defendants should be immediately enjoined not to destroy, erase, or otherwise make unavailable for further proceedings in this matter, any records or documents (including data or information maintained in computer media, including Defendants' personal computers and media and electronic email and other accounts) in Defendants' possession, custody, or control that were obtained from or contain information

derived from any AssuredPartners' records, including that pertaining to AssuredPartners clients, employees, or agents, or that refer or relate to any of the events alleged in this Complaint;

B.     Enter an order that the above-requested injunctions be binding upon Defendants, their respective affiliates, successors and assigns, and their respective agents, servants, employees, representatives, attorneys and persons in active concert or participation with them;

C.     Award AssuredPartners such damages as may be proven at trial, including without limitation, compensatory, punitive, exemplary, and/or statutory damages, plus attorney's fees, interest and costs;

D.     Enter an order imposing a constructive trust overall revenues received by Defendants as a result of Defendants' unlawful conduct, including, but not limited to, breach of contract, breach of fiduciary duties, tortious interference with contracts, business relationships or expectancies, misappropriation of trade secrets, civil conspiracy, fraud, and deception;

E.     Direct that an accounting be conducted of all work, proceeds, revenue, commissions, and profits of Defendants concerning any proceeds, revenue and profits of business obtained as a result of Defendants' unlawful conduct, and award all such proceeds and profits to AssuredPartners;

F.     Award AssuredPartners its attorney's fees and costs incurred in prosecuting this action, including but not limited to pursuant to 18 U.S.C. § 1836(b); and

G.     Award AssuredPartners such other and further relief as this Court deems just and proper.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By:   s/ Todd J. Kaiser
    Todd J. Kaiser, IN 10846-49
    111 Monument Circle, Suite 4600
    Indianapolis, IN  46204
    Telephone:  317.916.1300
    Facsimile:  317.916.9076
    *todd.kaiser@ogletree.com*

Attorneys for Plaintiff  AssuredPartners NL, LLC

34640262.2